IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CARLOS O. DEAN,              *
        *Plaintiff*,          *
                             *
    v.                      *          CIVIL NO. SKG-09-007
                             *
MICHAEL J. ASTRUE,          *
Commissioner of             *
Social Security             *
        *Defendant*.         *
*   *   *   *   *   *   *   *   *   *   *   *   *

MEMORANDUM OPINION

Plaintiff, Carlos O. Dean, filed this action on January 5, 2009 seeking judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant"), denying his claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 405(g) and Supplementary Security Income ("SSI") under Title XI of the Social Security Act, 42 U.S.C. §§ 1381-1383(c).

Cross motions for summary judgment are currently pending before this Court. (Paper Nos. 15, 23). No hearing is necessary in this case. Local Rule 105.6. For the reasons set forth below, this Court DENIES plaintiff's motion for summary judgment, DENIES defendant's motion for summary judgment, and GRANTS plaintiff's motion to remand the case for further proceedings consistent with this decision.

I.  Procedural History

Plaintiff filed an application for DIB and SSI on May 12, 2005, alleging disability beginning May 22, 2003 due to severe lower back pain.[1] (R. 37). The Social Security Administration ("SSA" or "Agency") denied plaintiff's initial claim for benefits on July 11, 2005, (R. 53-56), as well as his subsequent application for reconsideration on April 12, 2006. (R. 50-51). Following a hearing on August 10, 2007, the Administrative Law Judge ("ALJ") rendered an unfavorable decision, finding that plaintiff's impairment did not meet or equal any of the listings under 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 29-30). The Agency's Appeals Council denied plaintiff's request for review on November 5, 2008, thus rendering the ALJ's decision the final reviewable decision of the Agency. (R. 6-9). Plaintiff then timely filed the instant action pursuant to 42 U.S.C. § 405(g), seeking review of the ALJ's decision. (Paper No. 1).

## II.  **Factual Background**

Plaintiff was born on August 10, 1955. (R. 15). He did not complete high school or earn a GED. (R. 314). Plaintiff lives with his wife, who takes care of him. (R. 316-17).

---

[1] In his application, plaintiff elaborated that he suffers from three herniated discs as a result of a work-related accident on May 22, 2003. (R. 76-77). He further described that, due to his injury, he cannot "stand for very long or sit for very long." (R. 77). A disc herniation is defined as a "protrusion of the nucleus pulposus or annulus fibrosus of an intervertebral dis[c], which may impinge on nerve roots." Dorland's Illustrated Medical Dictionary 863 (31th ed. 2007).

Plaintiff has a fairly extensive work history over the last 15 years, having been employed off and on since 1988 in a variety of capacities, including as a welder, cabinet maker, and maintenance man. (R. 99). On May 22, 2003, while plaintiff was working as woodworker, he was "spray painting a giant brace," when it began to fall. (R. 306). Plaintiff grabbed the brace to keep it from falling over, and his back "popped like a zipper." (Id.).

At the hearing, plaintiff testified that, ever since his accident, he has had a "constant, aching pain" in his back. (R. 307). Specifically, he stated that, on a scale of one to ten, his pain varies between seven and ten.[2] (R. 307-308). During the hearing, plaintiff stated that he could only remain standing for ten to 45 minutes, depending on the type of surface on which he was standing. (R. 312). Plaintiff further stated that he must sit with pillows propped around him for about an hour every day. (R. 311). He also told the ALJ that he must lie down about two times a day to relieve his back pain. (R. 312). Plaintiff stated that he was unable to go shopping with his wife as a result of his injury. (R. 73-74). Plaintiff also claims

---

[2] Plaintiff further described his pain as feeling "like somebody hit you in the head with a sledgehammer. Your spine just like hammers together and it's a real sharp, shooting pain." (R. 307). Plaintiff also testified that when he walked into the front door of the Office of Disability Adjudication and Review that morning he pulled his back out and experienced intense pain. (R. 307). Plaintiff next stated that he usually sleeps for two hours before waking up from the pain. (R. 315). However, whenever plaintiff takes medication prior to sleeping, he usually can sleep for about six hours. (R. 315).

to experience pain when doing routine tasks.[3]  (R. 308-09).

Plaintiff is able to perform light house work, but must pay to

have his lawn mowed because he is unable to do so himself.  (R.

94).  He also explained that he tries not to take medication

because when he does, the medicine makes him "too foggy to do

anything else."  (R. 311).  Plaintiff stated that he spends

between five to seven days per month in bed due to his back

pain.  (R. 310).

## A.  Medical History

On May 30, 2003, plaintiff first visited Grand View

Hospital complaining of lower back pain and indicating that he

had recently injured his back.  (R. 173).  After being seen by a

physician, plaintiff was diagnosed with lower back pain and

lumbar radiculopathy.  (R. 173-74).  He was prescribed Vicodin[4]

and Flexeril[5] to ease his pain.  (R. 173-74).  He returned

several days later on June 2, 2003, describing pain radiating

down his right lateral thigh.  (R. 169).  His treating nurse

noted that he walked with a pronounced limp.  (Id.).  Plaintiff

---

[3] Plaintiff described that after about 10 to 15 minutes of washing the dishes, he has to sit down for about 15 minutes before he goes continues with the task.  (R. 309).  In another example, plaintiff stated that sometimes he will pop his back out when he throws a bag of garbage into a dumpster.  (R. 308). Later in the hearing, plaintiff explained that when he states that his back "pops out," he means that "[s]omething in [his] back goes click and then after that [he goes] into pain for seven days."  (R. 323).
[4] Vicodin is a trademark for a prescription drug that contains hydrocodone and acetaminophen.  Vicodin is a narcotic analgesic that is used to relieve moderate to severe pain.  Physician's Desk Reference 560 (64th ed. 2010).
[5] Flexeril is a trademark for a drug that contains cyclobenzaprine hydrochloride, and is used to relieve skeletal muscle spasms without interfering with muscle function.  Flexeril is also known as Amrix or Fexmid. Id. at 964.

4

reported pain relief from taking medication. (Id.). The attending physician diagnosed plaintiff with lower back pain; prescribed Motrin,[6] Flexeril, and Vicodin; and recommended physical therapy. (R. 170). In addition, the physician recommended that plaintiff temporarily cease going to work. (Id.).

On June 6, 2003, plaintiff returned to Grand View Hospital for a third time, complaining of pain in his lower back and groin, and numbness in his thigh. (R. 164). Plaintiff was released to return to sedentary work that did not require him to lift more than ten pounds. (R. 165-66).

On June 9, 2003, plaintiff obtained an MRI examination of his lumbar spine, which showed "advanced diskogenic degenerative disease at L5-S1 …." (R. 211). The MRI revealed further abnormalities at L2-L3 (right-sided disc protrusion with possible enlargement of the nerve due to the protrusion and no stenosis),[7] L3-L4 (disc bulge with no evidence of nerve compromise, stenosis or disc extrusion), and L4-L5 (disc bulge and protrusion with no evidence of stenosis). (R. 211).

---

[6] Motrin is a trademark for a drug that contains ibuprofen and pseudophedrine hydrochloride, and is used to temporarily relieve symptoms of the common cold, sinusitis, and flu. Id. at 243-44.
[7] Spinal stenosis is a "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space. Symptoms are caused by compression of the cauda equine and include pain, parethesias, and neurogenic claudication." Dorland's, at 1698.

On June 12, 2003, plaintiff visited Grand View Hospital for the fourth time with complaints of lower back pain and numbness, however, he stated that the pain was "a little better." (R. 160). The attending physician authorized plaintiff to return to "moderate duty." (R. 161). In addition, the physician recommended more medication (Motrin, Flexeril, and Vicodin), hot and cold treatments for his back, continued physical therapy, and a follow-up appointment. (Id.).

On June 23, 2003, plaintiff obtained a second MRI of his lumbar spine, which revealed multilevel degenerative disc disease changes from L2-L3 through L5-S1 with probable disc herniation and disc fragment. (R. 158-159).

On June 27, 2003, plaintiff returned to the Grand View Hospital emergency room, telling his nurse that he tried to take a walk the day before, but might have "go[ne] too far." (R. 153). As a result, plaintiff reported pain in his left lower back and numbness in his left thigh. (Id.). Plaintiff told his treating physician that physical therapy helped ease his pain. (R. 154). The attending physician discussed with plaintiff the possibility of epidural injections to relieve the pain and advised sedentary work only. (Id.).

Over the course of plaintiff's visits to Grand View Hospital, his examining physicians completed several "Return to Work" forms. (R. 152, 155, 162, 166, 171, 175). One form

indicated that plaintiff was temporarily unable to work as of
June 2, 2003.[8]  (R. 171).  The other forms indicated that
plaintiff could continue working, but with such restrictions as
never lifting significant weight, bending, or reaching.  (R.
163, 166).

On July 14, 2003, plaintiff began treatment with Dr. Ernest
E. Cope, III with Upper Bucks Orthopaedic Associates.  (R. 221-
24).  Dr. Cope noted that plaintiff's gait was antalgic to the
right.  (R. 222).  Plaintiff reported that medication had worked
for him in the past.  (R. 221).  After reviewing plaintiff's
MRI, Dr. Cope diagnosed him with lumbar radiculitis due to a
herniated L2-L3 disc.  (R. 223).  Dr. Cope prescribed Vioxx,
recommended continued physical therapy, and referred plaintiff
to Dr. William E. Gusa, Jr., for a consultation on epidural
steroid injections.  (Id.).

On July 23, 2003, plaintiff visited Dr. Gusa of Pain
Medicine Specialists, P.C., to determine whether he needed an
epidural injection.  (R. 248).  Because plaintiff was
experiencing significantly reduced pain as a result of taking
Vioxx, Dr. Gusa concluded that the injections were unnecessary
at that time.  (R. 249).

Plaintiff returned to Dr. Cope on August 5, 2003 for a
follow-up evaluation, where Dr. Cope noted that plaintiff had

---

[8] On this form, however, the physician noted that plaintiff was to return to
the Hospital for a follow-up evaluation four days later.  (R. 171).

responded well to Vioxx, and that "[e]ssentially the pain is gone." (R. 219). At that time, although Dr. Cope noticed an improvement in plaintiff's hip and knee motion, he recommended that plaintiff undertake "light duty" only. (Id.). Plaintiff returned to Dr. Cope's office again on September 4, 2003, complaining of pain after he ran out of Vioxx. (R. 218). Dr. Cope refilled plaintiff's Vioxx prescription, but recommended that he return to Dr. Gusa for an epidural steroid injection if taking Vioxx failed to reduce his pain. (Id.).

Also following Dr. Cope's recommendation, plaintiff visited Dr. Robert W. Mauthe, a Board Certified Physiatrist, on February 2, 2004. (R. 241). After conducting a physical examination, Dr. Mauthe diagnosed plaintiff with an L2-3 disc protrusion and concluded that he "would be capable of light duty." (R. 242). Further, Dr. Mauthe recommended that plaintiff get an EMG and nerve conduction study to assess the amount of nerve root involvement. (Id.).

Plaintiff returned to Dr. Gusa on February 25, 2004, complaining that coughing made his pain worse and that the Vioxx had been less effective. (R. 246). At that time, Dr. Gusa administered an epidural steroid injection. (R. 247). Dr. Gusa administered additional injections on March 10, 2004 and March 24, 2004, when plaintiff's right leg and back pain returned.

(R. 244-45).  Plaintiff reported to Dr. Mauthe that the epidural injections helped to reduce his leg pain.  (R. 236).

On March 17, 2004, Dr. Mauthe conducted an EMG study of plaintiff.  (R. 236-39).  Dr. Mauthe reviewed the results of that study and found that there was no electrodiagnostic evidence of radiculopathy.  (R. 236).  Further, after examining plaintiff, Dr. Mauthe noted a negative straight-leg raising test.  (Id.).  On May 18, 2004, plaintiff returned to Dr. Mauthe, reporting that, although the epidural injections had completely resolved his leg pain, his back pain remained.  (R. 235).  Dr. Mauthe recommended an external spine simulator to help increase plaintiff's strength.  (Id.).

On May 21, 2004, at Dr. Mauthe's request, plaintiff underwent a Functional Capacity Examination ("FCE") by Amy S. Williams, an Assessment Specialist with the Weston Group.  (R. 225-27).  Based on his performance during his assessment, Ms. Williams concluded that plaintiff was capable of "light duty" for a 6-to-7-hour workday.  (R. 225).  Further, she noted that plaintiff should be able to either sit or stand for up to four hours for 45 minute durations, and walk for up to four or five hours for occasional long distances.  (Id.).  According to Ms. Williams, plaintiff could frequently squat, crawl, or kneel, and occasionally bend, stoop, climb stairs, crouch, or balance.  (R.

226).  Ms. Williams further concluded that plaintiff could occasionally lift and carry seventeen pounds.  (R. 227).

On July 9, 2004, plaintiff returned to Dr. Mauthe, who noted that plaintiff experienced tremendous improvement with the epidural injections and no longer exhibited any weakness in his legs.  (R. 234).

On July 27, 2004, at Dr. Mauthe's recommendation, plaintiff had a MRI scan of his lumbar spine.  (R. 228).  As compared to plaintiff's June 23, 2003 MRI, the July 27, 2004 MRI showed no significant changes in plaintiff's herniation at L2-3, disc bulge at L3-4, or herniation at L4-5.  (R. 229).  However, the MRI did reveal a new herniation without nerve impingement at L5-S1.  (Id.).  While the reviewing physician concluded that plaintiff's degenerative disc disease had progressed slightly, Dr. Mauthe reviewed the MRI and noted that it showed "[n]o real change from the past exam."  (Id.).  Dr. Mauthe also conducted a straight-leg test, with negative results.  (R. 233).

On July 5, 2005, Dr. Gerald Gryczko, a physician with the Maryland Disability Determination Services ("DDS"), completed a Physical Residual Functional Capacity Assessment form ("RFC") regarding plaintiff.  (R. 250-57).  After reviewing plaintiff's file,[9] Dr. Gryczko determined that plaintiff could occasionally

---

[9] Notably, on the RFC, Dr. Gryczko indicates that no treating or examining source statement(s) regarding plaintiff's physical capacities were on file. (R. 256).

10

lift and carry 20 pounds and frequently lift and carry 10
pounds.  (R. 251).  He also found that plaintiff could sit,
stand, or walk for, at most, 6 hours in an 8-hour workday.
(Id.).  With these findings, Dr. Gryczko opined that plaintiff's
back problems limited him to climbing, balancing, stooping,
kneeling, crouching, or crawling only occasionally.  (R. 252).
Finally, Dr. Gryczko concluded that plaintiff's alleged symptoms
and pain were "partially credible" when compared with
plaintiff's own statements regarding his daily activities, which
included bicycle riding, light housework, and climbing stairs.
(R. 255).

On January 10, 2006, plaintiff first visited Dr. Jui-Chih
Hsu, a family practitioner.  (R. 274-77).  After examining
plaintiff, Dr. Hsu diagnosed him with a herniated lumbar disc
and lumbar sprain.  (R. 274).  She treated plaintiff with a back
brace and medication, including Mobic,[10] Skelaxin,[11] and
Balacet.[12]  Dr. Hsu noted that plaintiff could not sit for more
than two hours in a workday, could not stand or walk for more
than one hour in a workday, and could never climb, carry, bend,

---

[10] Mobic (also known as Meloxicam) is a trademark for a non-steroidal anti-inflammatory drug, and is used to treat pain or inflammation.  Physician's Desk Reference 2334 (64th ed. 2010).

[11] Skelaxin is a trademark for a muscle relaxant that works by blocking nerve impulses (or pain sensations) in the brain.  Skelaxin is usually prescribed to patients undergoing physical therapy for acute skeletal muscle conditions.  Id. at 1848.

[12] Balacet (also known as Darvocet-N100) is a trademark for a combination of acetaminophen and propoxyphene, which is used to relieve mild to moderate pain with or without fever.  Id. at 3612.

squat, reach, crawl, or lift more than ten pounds.  (R. 275).
Further, plaintiff could only occasionally tolerate exposure to
temperature extremes or humidity.  (Id.).  Lastly, Dr. Hsu filed
out a "Medical Report Form" for the Cecil County Department of
Social Services.  (R. 274).  On this form, she indicated that
plaintiff's lumbar condition would last for more than twelve
months and preclude him from working until April 13, 2006.  (R.
276).

On January 13, 2006, plaintiff returned to Dr. Hsu,
complaining of pain in his lower back.  (R. 282-84).  Dr. Hsu
noted that plaintiff's symptoms continued to worsen.  (R. 282).
Accordingly, she recommended that he use a back brace, continue
taking Mobic, Skelaxin, and Balacet, and return in one month.
(R. 282, 284).

On February 7, 2006, the Maryland DDS referred plaintiff to
Dr. William Barrish, an Internist, for a medical examination.
(R. 258-62).  Dr. Barrish noted that, because "[l]imited medical
records" were available for his review, plaintiff's "history of
present illness [was] obtained directly from patient interview."
(R. 258).  However, Dr. Barrish did review plaintiff's MRIs,
which showed disc bulge, disc herniation, multi-level
degenerative disc disease, and facet hypertrophy.  (R. 260).
Further, Dr. Barrish noted that plaintiff had no assistive
device for walking, a full range of spinal motion with flexion,

and a limited range of motion with extension.  (R. 259).  Dr. Barrish found plaintiff could lift 10 pounds frequently and 20 pounds occasionally.  (R. 260).  He further found that plaintiff could only occasionally bend, crouch, crawl, or stoop.  (Id.). Upon completion of the examination, Dr. Barrish concluded that plaintiff could sit, stand, and walk for six to eight hours per day with frequent changes in position.  (Id.).

On March 27, 2006, Dr. Lee Robbins, a DDS physician, prepared plaintiff's second RFC.  (R. 263-70).  Basing his RFC on a review of plaintiff's record only, Dr. Robbins found that plaintiff was capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently.  (R. 264).  Dr. Robbins further found that plaintiff could sit, stand, or walk for six hours in an 8-hour workday.  (Id.).  Dr. Robbins noted that plaintiff's lower back pain was "not terribly abnormal," and that his symptoms were partially credible.  (R. 265).  Finally, Dr. Robbins concluded that plaintiff could occasionally climb, balance, stoop, kneel, crouch, or crawl.  (Id.).

On August 3, 2006, and January 15, 2007, plaintiff visited Dr. Thresher, complaining of continued lower back pain.  (R. 279-81).  Dr. Thresher noted that plaintiff suffered from

chronic back problems with herniated nucleus pulposus, but did

not opine as to plaintiff's ability to work.[13]

On August 1, 2007, several months after plaintiff's last

insured date,[14] plaintiff returned to Dr. Hsu.  (R. 279-81).  Dr.

Hsu again noted that plaintiff's symptoms had worsened, although

his activity level remained normal.  (R. 279).  Dr. Hsu

instructed plaintiff to wear his back brace at all times because

she noticed that he was present at her office without one.  (R.

281).

Shortly thereafter, on August 8, 2007, Dr. Hsu completed a

form entitled "Listing 1.04 Disorders of the Lumbar Spine"

("Listing 1.04 form").  (R. 285).  On this form, Dr. Hsu

indicated that plaintiff had a herniated disc and degenerative

disc disease.  (Id.).  Accordingly, Dr. Hsu indicated that

plaintiff could not work.  (Id.).  Dr. Hsu, however, did not

indicate that plaintiff's herniated disc compromised a nerve

root or spinal cord; that he had osteoarthritis, facet

arthritis, or a vertebral fracture; and that he exhibited any of

the criteria found in Listing 1.04 Criteria A of the listed

impairments.[15]  Lastly, Dr. Hsu did not state that plaintiff had

spinal arachnoiditis consistent with Listing 1.04(B), or spinal

---

[13] At the hearing, plaintiff's counsel indicated that Dr. Thresher "doesn't
want to get involved."  (R. 339).
[14] Plaintiff was insured until March 31, 2007.  (R. 57).
[15] Dr. Hsu did not check off (1) neuro-anatomic distribution of pain; (2)
limitation of motion of the spine; (3) motor loss accompanied by sensory
weakness; or (4) positive straight-leg raising test.  (R. 285).

stenosis consistent with Listing 1.04(C).  (Id.).  Dr. Hsu,
however, completed the remainder of the form and indicated that
she reviewed plaintiff's medical records.  (Id.).  She also
indicates that plaintiff's medical conditions keep him from
working as of January 13, 2006.  (Id.).

Plaintiff underwent another MRI scan on September 25, 2007,
after his hearing before the ALJ.  (R. 286).  This MRI showed
mild spondylotic[16] disc bulges at L2-L3, L4-L5, L5-S1, and L3-L4.
(R. 286-87).  The MRI further revealed a disc herniation at L2-
L3 with mild facet arthropathy causing mild to moderate stenosis
of the right neural foramen, and a small migrated disc
herniation at L4-L5.  (Id.).  The MRI indicated mild stenosis at
L3-L4 in the neural foramina, lateral recesses, and central
canal.  (R. 286).  Finally, the MRI showed minimal stenosis at
L4-L5 in the lateral recesses and neural foramina, and at L5-S1
in the lateral recesses and neural foramina.  (R. 287).

On October 10, 2007, plaintiff underwent an Independent
Medical Evaluation ("IME") by Dr. Raymond D. Drapkin of Maryland
Orthopedics, P.A. (R. 291-92).  Upon examination, Dr. Drapkin
noted that plaintiff experienced pain with a range of motion,
tested positive for straight-leg raising, experienced weakness
on the right side, and experienced numbness in his right thigh.

---

[16] The National Institute of Health defines "spondylitis" as an inflammation
of the vertebrae.  National Institute of Health, Medline Plus, Medical
Dictionary, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (last
visited Mar. 11, 2010).

(R. 292).  With these findings, Dr. Drapkin concluded that
plaintiff was "permanently disabled and … unable to work."
(Id.).

On that same day, Dr. Drapkin completed a Listing 1.04
form.  (R. 290).  On the form, he indicated the presence of
herniated discs, spinal stenosis, osteoarthritis, degenerative
disc disease, and facet arthritis.  (Id.).  Dr. Drapkin
indicated that plaintiff's condition resulted in the compromise
of a nerve root.  (Id.).  Under Listing 1.04 Criteria A, Dr.
Drapkin found that plaintiff exhibited all necessary elements,
except for the required motor loss.  (Id.).  Under Listing
1.04(B), Dr. Drapkin found that plaintiff exhibited none of the
requirements.  (Id.).  Lastly, regarding Listing 1.04(C), Dr.
Drapkin did not find stenosis revealed through appropriate
medical imagery, and he did not find that plaintiff was unable
to ambulate effectively.  (Id.).  Notably, Dr. Drapkin indicated
that his findings applied retroactively to May 22, 2003,
although he did not indicate whether he reviewed plaintiff's
medical records.  (Id.).

On May 24, 2008, plaintiff returned again to Dr. Hsu.  (R.
15-17).  Dr. Hsu noted that plaintiff's symptoms had worsened,
even though his activity level remained normal.  (R. 15).  Dr.
Hsu also indicated that plaintiff had a displaced intervertebral

disc.  (R. 17).  Dr. Hsu recommended that plaintiff take medication for pain relief and use a back brace.  (R. 17).

On June 25, 2008, plaintiff underwent an additional IME from Dr. Drapkin.  (R. 13-14).  Dr. Drapkin noted a restricted range of motion, positive straight-leg raise test, numbness in the right thigh, and weakness in the right leg.  (R. 13).  Dr. Drapkin repeated his previous opinion that plaintiff was "permanently disabled and … unable to work."  (R. 14).

On July 7, 2008, Dr. Drapkin completed a second Listing 1.04 form, where he indicated that plaintiff exhibited all the requirements to meet Listing 1.04(A).  (R. 302).  Dr. Drapkin made no indication that plaintiff met any of the requirements for Listing 1.04(B).  For Listing 1.04(C), however, Dr. Drapkin indicated that plaintiff exhibited all the requirements, except for findings on appropriate medical imaging and the inability to ambulate effectively.  (R. 302).  Lastly, Dr. Drapkin indicated that plaintiff's medical condition applied retroactively to May 22, 2003, and that his opinions were based on a review of the medical records dating back to the stated onset date.  (Id.).

**B.   Vocational Expert's Testimony at Hearing**

On August 10, 2007, plaintiff appeared and testified at a hearing before Judge Benitz of the Office of Disability Adjudication and Review ("ODAR").  (R. 305).  Also present was Vocational Expert ("VE"), Mitchell Schmidt.  (Id.).

After hearing testimony from plaintiff, the ALJ examined the VE. (R. 331). The ALJ asked the VE hypothetically whether (1) an individual 47 years of age with a ninth-grade education, (2) suffering from degenerative disc disease, who must (3) alternate sitting and standing every 15 to 20 minutes during an eight-hour workday, (4) lift 10 pounds frequently, and (5) avoid prolonged climbing, balancing, temperature and humidity extremes, stair climbing, overhead reaching, or vibration, could find jobs in the national economy. (R. 335). The VE testified that such an individual would be able to find work. (R. 336). The VE testified that such an individual could work as a recreation aide,[17] garment sorter,[18] and checker.[19] (R. 336-37). The VE further testified that all of those jobs would allow an individual to alternate sitting and standing as much as required. (R. 336). Next, plaintiff's attorney questioned the VE. (R. 337). Plaintiff's attorney asked hypothetically whether sufficient jobs existed in the national economy for that same individual, if he also had to miss about five days a month due to severe back pain. (Id.). The VE responded, "No."

---

[17] The VE further described that a recreation aide is the person at the front desk of a YMCA, health club, or youth athletic club. (R. 336). He explained that recreation aides check memberships, answer phones, and show members around the facility. (Id.). Lastly, he stated that there were about 200 of these jobs available locally and about 425,000 nationwide. (Id.).
[18] The VE stated that there were 2,200 of these jobs available locally and about 1.4 million in the national economy. (R. 336).
[19] The VE explained that a checker is the person "you might see at the front of a Wal-Mart store that checks people's bags against their receipts when they're going out the door." (R. 336). The VE stated that there were 400 available positions locally, and about 900,000 available nationwide. (Id.).

(Id.).  Next, plaintiff's attorney asked whether there would be
sufficient jobs in the national economy for that same
hypothetical individual, if he also had to lie down for about 45
minutes at a time, twice a day.  (Id.).  The VE responded, "No."
(R. 338).  Lastly, plaintiff's attorney asked whether jobs
existed for that same individual, if he also experienced pain on
a level of seven out of ten, and occasionally ten out of ten.
(Id.).  Once again, the VE responded, "No."  (Id.).  After
questioning by plaintiff's attorney, the ALJ closed the record.
(R. 338-39).  Subsequent to the hearing, but prior to the ALJ's
decision, plaintiff submitted four documents, which were
incorporated into the record: (1) Dr. Hsu's Listing 1.04 form,
(2) an MRI dated September 25, 2007, (3) Dr. Drapkin's October
2007 Listing 1.04 form, and (4) Dr. Drapkin's IME dated October
10, 2007.  (R. 4).

## III. <u>ALJ Findings</u>

In evaluating plaintiff's claim for disability, the ALJ
must follow the sequential five-step process set forth in 20
C.F.R. § 404.1520.  The first step requires plaintiff to prove
he is not engaged in "substantial gainful activity."[20]  If the

---

[20] Substantial gainful activity is defined as "work activity that is both
substantial and gainful."  20 C.F.R. § 416.972 (2007).  Work activity is
substantial if it involves doing significant physical or mental activities.
20 C.F.R. § 416.972(a).  Gainful work activity is the type of work usually
done for pay or profit, regardless of whether a profit is realized.  20
C.F.R. § 416.972(b).  Substantial gainful activity does not include
activities such as household tasks, taking care of oneself, social programs,
or therapy.  20 C.F.R. § 416.972(c).

ALJ finds that plaintiff is engaged in "substantial gainful activity," plaintiff will not be considered disabled. Here, the ALJ found that plaintiff had not engaged in "substantial gainful activity" since his alleged disability onset date of May 22, 2003. (R. 27).

At step two of the analysis, the ALJ determines whether plaintiff's physical and mental impairments, considered jointly and severally, are "severe" and whether those impairments have lasted or are expected to last at least twelve months. 20 C.F.R. § 404.1520 (2007). Here, the ALJ concluded that plaintiff has a severe impairment in the form of degenerative disc disease of the lumbar spine, and the impairment lasted longer than 12 months. (R. 27).

Under step three, the ALJ considers whether the plaintiff's impairments, either severally or in combination, meet or medically equal an impairment enumerated in the "Listing of Impairments" in 20 C.F.R. part 404, subpart P, Appendix 1 ("Listing"). Here, the ALJ determined that plaintiff's degenerative disc disease of the lumbar spine was insufficiently severe to meet or medically equal one of the impairments in the Listing. (R. 29-30).

If plaintiff's impairments do not meet or equal an impairment in the Listing, the ALJ proceeds to step four, where he assesses plaintiff's residual functional capacity ("RFC") to

perform past relevant work.[21]  20 C.F.R. § 404.1560(b)(1).  Here,

the ALJ found that plaintiff could not perform past relevant

work, but retained the RFC to perform light work.[22]  (R. 30).

Specifically, the ALJ found that plaintiff could perform work

that allowed him to alternate sitting and standing every ten to

twenty minutes on a consistent basis in an eight-hour workday.

(R. 30).  Further, the ALJ determined that plaintiff "would need

to avoid heights and hazardous machinery … and would need a job

with no prolonged climbing, balancing, stooping, exposure to

temperature extremes and humidity, stair climbing, overhead

reaching, and exposure to vibration."  (R. 30).

    If the ALJ determines that plaintiff does not retain the

RFC to perform past relevant work, the burden shifts to the

Commissioner at the fifth and final step.  Pass v. Chater, 65

F.3d 1200, 1203 (4th Cir. 1995).  At this step, the Commissioner

must assess whether, in light of vocational factors such as age,

---

[21] The SSA defines "past relevant work" as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. § 404.1560(b)(1).
[22] Light work is defined as follows:
    Light work involves lifting no more than 20 pounds at a time with
    frequent lifting or carrying of objects weighing up to 10 pounds.
    Even though the weight lifted may be very little, a job is in
    this category when it requires a good deal of walking or
    standing, or when it involves sitting most of the time with some
    pushing and pulling of arm or leg controls. To be considered
    capable of performing a full or wide range of light work, you
    must have the ability to do substantially all of these
    activities. If someone can do light work, we determine that he or
    she can also do sedentary work, unless there are additional
    limiting factors such as loss of fine dexterity or inability to
    sit for long periods of time.
20 C.F.R. § 404.1567(b).

education, work experience and RFC, the plaintiff is capable of other work in the national economy.  20 C.F.R. § 404.1520(g). The Agency must also prove the existence of and plaintiff's capacity to perform alternative work.  Grant v. Schweiker, 699 F.2d 189, 191 (4th Cir. 1983).

At this fifth step, the ALJ determined that "there are jobs that exist in significant numbers in the national economy that [plaintiff] can perform."  (R. 34).  The ALJ concluded that plaintiff was able to perform the following jobs at the sedentary and light levels: recreation aide (200 jobs locally and 425,000 jobs nationally); garment sorter (2200 jobs locally and 1.4 million jobs nationally); and checker (400 jobs locally and 900,000 jobs nationally).  With these findings established, the ALJ concluded that plaintiff had not been disabled during the relevant period and was therefore not entitled to disability benefits.  (R. 35).

## IV.  **Standard of Review**

The primary function of this Court in reviewing Social Security disability determinations is not to try plaintiff's claims *de novo*, but rather to leave the findings of fact to the Agency and to determine upon the record as a whole whether the Agency's decision is supported by substantial evidence and whether the correct legal standard was applied.  42 U.S.C. §§ 405(g), 1383(c)(3); Craig v. Chater, 76 F.3d 585, 589 (4th Cir.

1996); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence exists when the record contains "more than

a mere scintilla of evidence but somewhat less than a

preponderance." Craig, 76 F.3d at 589 (citing Laws v.

Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). It is "such

relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." Hunter v. Sullivan, 993 F.2d 31, 34

(4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389,

390 (1971)). In other words, "[i]f there is evidence to justify

a refusal to direct a verdict were the case before a jury, then

there is 'substantial evidence.'" Id. (quoting Celebrezze, 368

F.2d at 642).

    In its review for substantial evidence, this Court does not

determine the weight of the evidence or substitute its own

judgment for that of the Commissioner. Hays, 907 F.2d at 1456.

However, "[a] factual finding by the ALJ is not binding if it

was reached by means of an improper standard or misapplication

of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.

1987). Therefore, the deferential standard of review applied to

the Agency's finding of fact does not apply to its conclusions

of law or its application of legal standards and procedural

rules. Wiggins v. Schweiker, 679 F.2d 1387, 1396 (11th Cir.

1982). After review, this Court is empowered by 42 U.S.C. §

405(g) to affirm, modify, or reverse the decision of the

Commissioner with or without remanding the case for rehearing. Melkonya v. Sullivan, 501 U.S. 89, 98 (1991).

It should be noted that the Court must keep some additional considerations in mind when reviewing disability determinations. First, hearings on applications for Social Security disability benefits are not adversary proceedings. Easley v. Finch, 431 F.2d 1351, 1353 (4th Cir. 1970). Second, the Social Security Act is a remedial statute that is to be broadly construed and liberally applied in favor of beneficiaries. Dorsy v. Bowen, 828 F.2d 246, 248 (4th Cir. 1987). Finally, a plaintiff is entitled to a full and fair hearing, and any failure to have such a hearing may constitute sufficient cause to remand the case. Sims v. Harris, 631 F.2d 26, 27 (4th Cir. 1980).

## V.   **Discussion**

On appeal, plaintiff raises several arguments. Preliminarily, plaintiff contends that the Appeals Council improperly refused to review the ALJ's decision in light of new evidence. (Paper No. 15, 5, 8). Additionally, plaintiff argues that the ALJ erred in holding that plaintiff was not disabled. Specifically, plaintiff argues that the ALJ (A) incorrectly weighed medical opinions in concluding plaintiff did not satisfy Listing 1.04, (Paper No. 15, 11-16); (B) improperly attacked plaintiff's credibility, (Paper No. 28, 18-21); (C) failed to consider all of plaintiff's various back impairments in

combination, (Paper No. 28, 16-18); and (D) erred in concluding

that plaintiff could perform jobs in the national economy (Paper

No. 28, 4-6).  For the reasons discussed below, this Court

hereby remands the case and directs the ALJ to further develop

the record by referring plaintiff for a further consultative

examination by an orthopedist and for further proceedings

consistent with this decision.

### A.   The Appeals Council Correctly Declined to Review the ALJ's Decision in Light of New Evidence Submitted by Plaintiff

Plaintiff argues that the Appeals Council erred by failing

to review the ALJ's decision in light of Dr. Drapkin's Listing

1.04 form of July 7, 2008, which indicates that plaintiff meets

all of the requirements for Criteria A.  (Paper No. 15, 5, 8).

Pursuant to 20 C.F.R. § 404.970(b), the Appeals Council

must consider evidence submitted with a request for review "if

the additional evidence is (1) new,[23] (2) material,[24] and (3)

relates to the period on or before the date of the ALJ's

decision."  Wilkins v. Sec'y, Dep't of Health & Human Servs.,

953 F.2d 93, 95-96 (4th Cir. 1991); see also 20 C.F.R. §

404.970(b) ("If new and material evidence is submitted, the

Appeals Council shall consider the additional evidence only

---

[23] Evidence is new if it is not duplicative or cumulative.  Wilkins, 953 F.2d at 96.
[24] Evidence is material if there is a reasonable possibility that it would have changed the outcome of the ALJ's decision.  Borders v. Heckler, 777 F.2d 954, 956 (4th Cir. 1985).

where it relates to the period on or before the date of the [ALJ's] decision."). The Appeals Council must then evaluate the entire record including the new evidence and determine whether the ALJ's findings are contrary to the weight of the evidence. 20 C.F.R. § 404.970(b).

Whether the Appeals Council correctly refused to review the ALJ's decision in light of Dr. Drapkin's July 2008 Listing 1.04 form is a close question. While the form is new and relates to the period on or before the ALJ's decision, it may not be material to plaintiff's case. The July 2008 form is new because it was completed after the ALJ rendered his decision on plaintiff's disability, and provides non-cumulative evidence, that is, Dr. Drapkin's views on certain 1.04 criteria. Further, although the form was prepared after the ALJ's decision, it nonetheless pertains to plaintiff's pre-decision physical condition because the form indicated that plaintiff was disabled as of May 22, 2003. See, Wilkins, 953 F.2d at 96 (holding that a physician's letter related back to the period before the ALJ's decision because it related to the plaintiff's pre-decision impairment).

However, the July 2008 Listing 1.04 form does not appear material because it is unlikely to have persuaded the ALJ to reach a different conclusion even had he assigned Dr. Drapkin's opinions appropriate weight. See infra Part V.2.i (discussing

how the ALJ assigned Dr. Drapkin's medical opinions insufficient
weight).  Even Dr. Drapkin's July 2008 Listing 1.04 form did not
indicate that plaintiff met every element of Listing 1.04.[25]  (R.
302).  Dr. Drapkin's original Listing 1.04 form, completed in
2007, indicated that plaintiff did not meet any prong of Listing
1.04: 1.04(A) (motor loss), 1.04(B) (spinal arachnoiditis), or
1.04(C) (ineffective ambulation).  (R. 290).  His 2008 Listing
1.04 form was identical with one exception: Dr. Drapkin "checked
the box" to indicate that plaintiff suffered from the requisite
motor loss to satisfy 1.04(A).  (R. 302).  Dr. Drapkin's 2008
form still did not unequivocally demonstrate that plaintiff
satisfied all of 1.04(B) or all of 1.04(C), and thus would not
likely have materially changed the ALJ's opinion as to
plaintiff's disability.

Accordingly, the Appeals Council correctly declined to
review the ALJ's decision.  Nevertheless, the ALJ should
consider Dr. Drapkin's July 2008 Listing 1.04 form with the rest
of the evidence on remand.  See 20 C.F.R. § 404.916(c)
(requiring an ALJ to review any new evidence submitted in
connection with a request for reconsideration).  See also
Mullinax v. Sec'y, Dep't of Health & Hum. Servs., 924 F.2d 1052,

---

[25] Although Dr. Drapkin's earlier Listing 1.04 form of October 2007 indicated
that plaintiff did not exhibit the required motor loss under Listing 1.04(A),
Dr. Drapkin had not reviewed plaintiff's medical records at that time.  See
(R. 290) (indicating that the physician's opinions were not based on a review
of plaintiff's medical records).

*4 (4th Cir. 1991) (unpublished) ("Unlike in the courts, where

the record is closed following trial, in disability

administrative proceedings a claimant may add factual material

to his record at any point in the administrative process until

the Secretary makes a final appealable order at the Appeals

Council level.  The hearing before the ALJ is but one point in

the middle of a many-layered adjudicatory process, at any point

of which a claimant (or the Secretary, for that matter) may

continue to add record information).")

**B.   Weight of Medical Opinions**

Plaintiff contends that the ALJ improperly weighed medical

opinions.  (Paper No. 15, 11-16).  Specifically, plaintiff

claims that the ALJ gave (i) too little weight to Dr. Drapkin's

opinions, (Paper No. 28, 10-14); (ii) too much weight to Dr.

Barrish's opinions, (Paper No. 28, 6-8); (iii) too much weight

to the two State Agency Consultants, (Paper No. 28, 8-10); and

(iv) too little weight to Dr. Hsu's reports.  For the reasons

set forth below, this Court agrees with plaintiff and finds that

the ALJ incorrectly assigned weight to medical opinions in the

record.[26]

>            1.   The ALJ Gave Insufficient Weight to Dr. Drapkin's
>                 Medical Opinions

---

[26] Although this Court appreciates the ALJ's thorough and well-drafted
opinion, the ALJ's assignment of weight to certain medical opinions was
nonetheless incorrect.

Plaintiff asserts that the ALJ erred by giving Dr. Drapkin's opinion little weight, considering that he is a Board Certified Orthopedic Surgeon with 30 years of experience, and that he examined the plaintiff twice regarding issues pertinent to his specialty. (Paper No. 28, 10). Accordingly, plaintiff asserts that Dr. Drapkin should be considered a treating physician. (Paper No. 28, 10). Further, plaintiff argues that he did not seek treatment from Dr. Drapkin until October 10, 2007, several months after his last date of insurability, due to a lack of health insurance. (Paper No. 28, 10). Plaintiff argues that he cannot be penalized for failing to seek treatment that he could not afford. (Paper No. 28, 10).

The ALJ misapplied SSA regulations in assigning little weight to Dr. Drapkin's Listing 1.04 form and Independent Medical Evaluation, both completed on October 10, 2007. The Agency defines a treating physician as plaintiff's "own physician, psychologist or other medical source who provides or has provided [the claimant] with medical treatment or evaluation or who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. The treating physician's opinions may be given controlling weight when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [consistent] with the other substantial evidence in [the] case record." Mastro v. Apfel,

270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. § 404.1527(d)(2).
When an examining physician's opinions are not given controlling
weight, the ALJ evaluates and weighs the opinions "pursuant to
the following non-exclusive list: (1) whether the physician has
examined the applicant, (2) the treatment relationship between
the physician and the applicant, (3) the supportability of
the physician's opinion, (4) the consistency of the opinion with
the record, and (5) whether the physician is a specialist."
 Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005)
(citing 20 C.F.R. § 404.1527).

    The ALJ incorrectly gave Dr. Drapkin's medical opinions
insufficient weight because his opinions satisfy the factors
above and are supported by the record as a whole.  First, Dr.
Drapkin fully examined plaintiff twice; once on October 10, 2007
and again on June 25, 2008.  (R. 13, 291).  Second, Dr. Drapkin
supported his opinion that plaintiff was disabled with ample
evidence.  Dr. Drapkin tested plaintiff's range of motion,
noting that "[t]here is pain with any range of motion."  (R.
13).  Dr. Drapkin also noted that plaintiff exhibited weakness
of his right side, three disc herniations, and "significant
radiculopathy on the right side."  (R. 292).  These findings
support an opinion of disability.  Third, Dr. Drapkin's medical
opinions are not inconsistent with the record as a whole.  It is
important to note at the outset that plaintiff has a

degenerative chronic lumbar condition. This explains how plaintiff's medical evaluations over the period from the onset date to plaintiff's last insured date (March 31, 2007) indicate a worsening condition. Initially in 2003 and 2004, physicians who treated plaintiff noted that he was capable of performing light work. See, e.g., (R. 219, 242). As time progressed, however, plaintiff's condition deteriorated. Towards the end of plaintiff's insured period, Dr. Hsu and Dr. Drapkin both opined that plaintiff was disabled as a result of his chronic lower back condition. Further, while not perfectly aligned, Dr. Drapkin's opinion is not inconsistent with Dr. Barrish's and Dr. Hsu's examination of plaintiff. Compare (R. 258) with (R. 281, 291). For example, all three physicians indicated that plaintiff experienced pain on his right side when performing the straight-leg raising test. (R. 259, 281, 291). Moreover, Dr. Drapkin's opinion that plaintiff cannot work due to his disability is not necessarily inconsistent with the FCE conducted on May 20, 2004. (R. 225). The FCE stated that plaintiff was qualified for light work for six to seven hours at the most. (R. 225). The ALJ ignores this crucial aspect of the FCE, reading it as an opinion that the plaintiff is capable of working a full, eight hour workday. However, six to seven hours is not a full-time workday, and thus Dr. Drapkin's opinion that plaintiff cannot work for a full workday is supported in the

record.  Accord (R. 275 (Dr. Hsu's evaluation is that Mr. Dean

can only sit for two hours, walk for one hour and stand for one

hour)).  Fourth, as discussed above, see supra Part V.1, Dr.

Drapkin is a specialist in Orthopedic Surgery and is a board

certified physician with 30 years of experience.  Dr. Drapkin

was the only orthopedic surgeon to review and opine on

plaintiff's orthopedic condition, and thus should be accorded

greater weight than the ALJ assigned.

Plaintiff argues that "it flies in the face of the patent

purposes of the Social Security Act to deny benefits to someone

because he is too poor to obtain medical treatment that that may

help him." Gordon v. Schweiker, 725 F.2d 231, 237 (4th Cir.

1984).  There can be little question that the limited nature of

Mr. Dean's medical evaluation and treatment is largely a

function of his financial situation.[27]  Plaintiff has shown good

cause for his delayed evaluation and treatment due to his

---

[27] Since his accident in May 2003, plaintiff has not been able to earn a
single paycheck. (R. 57-58).  Except for a Workers' Compensation settlement
of $33,000 in 2005, the only family income has been his wife's.  Her job as a
school bus driver during the academic year would provide modest income at
best. (R. 317).  In his application for SSI and DIB, plaintiff stated that
his wife had to work more hours to support the family. (R. 92).  Plaintiff
further stated that he was looking for a clinic because he did not have
health insurance. (R. 108).  Another time, he reported that he does not get
treatment for his back now except from his family physician, Dr. Hsu, because
he has no insurance and no money.  Dr. Barrish also noted that Mr. Dean "is
not currently in a treatment program as he is relocated and attempting to
obtain medical coverage. (R. 260).  In addition, Dr. Drapkin noted in his
medical evaluation on June 25, 2008 that plaintiff "does not have health
insurance and really cannot afford treatment." (R. 13).  Lastly, plaintiff's
regular treatment with Drs. Cope, Gusa, and Mauthe was evidently paid through
plaintiff's workers' compensation benefits.  Those benefits, however, ended
in 2005. (R. 140).

financial situation.  Accordingly, on remand and for all the
reasons discussed, the ALJ should assign Dr. Drapkin's medical
opinions, including his July 2008 Listing 1.04 form, greater
weight in assessing whether plaintiff is disabled under SSA
regulations.

2.    The ALJ Inaccurately Assigned Dr. Barrish's
      Medical Opinions Too Much Weight

Plaintiff argues that the ALJ erred in giving any weight to
Dr. Barrish's medical opinions because, as an internist, he was
not the appropriate doctor to evaluate plaintiff's spinal
disorders.  (Paper No. 28, 6).  Further, plaintiff argues that
Dr. Barrish's medical opinions lack a proper foundation because
(1) he failed to take adequate medical history, for example, to
inquire about the side effects of medication and the impact of
inclement weather on pain; and (2) he reported that plaintiff
exhibited one herniated disc despite reports by two radiologists
that plaintiff had three herniated discs.  (Paper No. 28, 7).
Accordingly, plaintiff asserts that Dr. Barrish's opinions
should not be given any weight because of their "egregious
errors."  (Paper No. 28, 7).

This Court agrees with plaintiff in that the ALJ misapplied
the law in assigning Dr. Barrish's opinions "partial weight."
First, Dr. Barrish indicated that he only had limited medical
records for his review.  (R. 258).  As a result, the majority of

information regarding plaintiff's medical history was obtained
solely from the plaintiff. In the case of a degenerative,
chronic condition, this lack of a complete medical history
necessarily weakens any conclusions. Moreover, his lack of
acknowledgement of the severity of his degenerative condition as
evidenced by MRI also undermines his conclusions. (R. 258).
Second, Dr. Barrish only examined plaintiff once, and the
examination was not for treatment purposes, but rather to assess
plaintiff's disability claims. (R. 258); see 20 C.F.R. §
404.1527(d)(2)(i) ("When the treating source has seen you a
number of times and long enough to have obtained a longitudinal
picture of your impairment, we will give the source's opinion
more weight than we would give it if it were from a nontreating
source."). At no point in his medical opinion does Dr. Barrish
provide a treatment plan for plaintiff given his lumbar
condition. (R. 258-260). Third, Dr. Barrish is not a
specialist in the field of orthopedic surgery. See 20 C.F.R. §
404.1527(d)(5) ("We generally give more weight to the opinion of
a specialist about medical issues related to his or her area of
specialty than to the opinion of a source who is not a
specialist."). While it is not possible to know exactly how much
weight the ALJ gave Dr. Barrish's opinions, it would appear that
they are deserving of little weight absolutely and certainly
less relative to Dr. Drapkin's. Thus, on remand, the ALJ should

34

reevaluate whether plaintiff is disabled while assigning Dr. Barrish's opinion little weight.

### 3. The ALJ Incorrectly Gave Too Much Weight to the Two State Agency Consultants' Opinions

Plaintiff next argues that the ALJ improperly gave weight to the opinions of two State Agency Consultants, Drs. Gryczko and Robbins. (Paper No. 28, 8-9). Specifically, plaintiff claims that, because the two consultants did not examine plaintiff or his medical record, their FCEs are not credible. (Paper No. 28, 8). Of course, the opinions of non-examining physicians are accorded some weight under the Social Security law. E.g., Gordon, 725 F.2d at 235 (recognizing that testimony of a non-examining, non-treating physician can be relied upon when it is consistent with the record, but should be discounted and is not substantial evidence when totally contradicted by other evidence in the record).

However, the ALJ incorrectly weighed the opinions of Drs. Gryczko and Robbins, at least vis a vis Drs. Drapkin and Hsu's opinions. He accorded "partial weight" to these two state agency consultants. While it is not possible to know exactly how much weight the ALJ gave these state agency consultants, it appears that they are deserving of minimal weight absolutely and certainly less relative to the opinions of Drs. Drapkin and Hsu. First, neither Dr. Gryczko nor Dr. Robbins examined the

plaintiff.  (R. 250-56, 263-70); <u>see</u> 20 C.F.R. § 404.1527(d)(1)

("Generally, we give more weight to the opinion of a source who

has examined you than to the opinion of a source who has not

examined you.").  Second, both physicians indicated that the

file they reviewed did not contain any treating or examining

medical statements.  (R. 256, 269), 20 C.F.R. § 404.1527(d)(6).

Further, Drs. Gryczko and Robbins did not note whether they

reviewed any or which of plaintiff's medical records.

Accordingly, on remand, the ALJ should reassess and assign

little weight, if any, to the medical opinions of these two

state agency consultants.

> 4.    The ALJ Incorrectly Accorded Dr. Hsu's Medical
>        Opinions Little Weight

Plaintiff contends that the ALJ erred by assigning little

weight to the medical opinions of Dr. Hsu, plaintiff's family

physician.  (Paper No. 28, 14-16).  Plaintiff claims that Dr.

Hsu examined him and reviewed his complete medical history with

a longitudinal view of plaintiff's condition over the course of

three office visits and therefore should have been considered a

treating physician.  (Paper No. 28, 14).  Lastly, plaintiff

argues that he had no insurance, and thus the fact that he only

visited Dr. Hsu three times should not discount Dr. Hsu's

treating physician status.  (Paper No. 28, 16).

According to Agency regulations, the medical opinion of a treating source is typically assigned greater weight than other non-treating opinions due to the nature of the relationship between patient and family doctor. Mastro v. Apfel, 270 F.3d 171, 178-79 (4th Cir. 2001); 20 C.F.R. § 404.1527(d). Just as with Dr. Drapkin, the ALJ assigned little weight to Dr. Hsu's medical opinions. Here, however, Dr. Hsu is undisputedly a treating physician. The mere fact that plaintiff visited Dr. Hsu only three times does not preclude her from assuming the status of a treating physician. See Benton ex. rel. Benton v. Barnhard, 331 F.3d 1030, 1039 (9th Cir. 2003) (holding that a psychiatrist could be considered a treating physician after one visit, but that the weight of the psychiatrist's opinion would be low on the continuum of treating physicians). Indeed, Dr. Hsu examined plaintiff on three different occasions, and during each visit she created a plan for treating plaintiff's chronic condition. (R. 15-17, 279-81, 282-84), 20 C.F.R. § 404.1527(d)(2). Thus, on remand the ALJ should assign Dr. Hsu's medical opinions greater weight, especially vis a vis the opinions of the state agency consultants.

### C. The ALJ's Assessment of Plaintiff's Credibility

Next, plaintiff contends that the ALJ improperly assessed his credibility. (Paper No. 28, 18). An ALJ must evaluate the "intensity and persistence of the claimant's pain, and the

extent to which it affects [his] ability to work." See Craig v.
Chater, 76 F.3d 585, 595 (4th Cir. 1996). To determine the
credibility of a claimant's alleged symptoms, an ALJ must assess
several factors, such as the claimant's daily activities and the
effectiveness of any medication.[28] Here, after reviewing
plaintiff's subjective complaints, the ALJ properly determined
that, although plaintiff's impairment could reasonably produce
the alleged symptoms, his statements "concerning the intensity,
persistence and limiting effects of these symptoms are not
entirely credible." (R. 31).

In support of his finding, the ALJ cited medical records,
but predominantly in the time more immediately after the
accident. (R. 27-35). First, the earlier medical records
indicated that medication, physical therapy, and epidural
injections significantly reduced plaintiff's pain. (R. 215-27).
On one occasion, Dr. Cope's medical report indicated that
plaintiff stated, "Essentially, the pain is gone" as a result of
taking Vioxx. (R. 219). Further, on July 14, 2003, December

---

[28] Other important factors include:
(1) the claimant's daily activities; (2) the location, duration,
frequency, and intensity of the claimant's pain or other
symptoms; (3) factors that precipitate and aggravate the
symptoms; (4) the type, dosage, effectiveness, and side effects
of any medication the claimant takes or has taken to alleviate
pain or other symptoms; (5) treatment, other than medication, the
claimant receives or has received for relief of pain or other
symptoms; (6) any measures other than treatment the claimant uses
or has used to relieve pain or other symptoms; and (7) any other
factors concerning the claimant's functional limitations and
restrictions due to pain or other symptoms.
S.S.R. 96-7p (1996 WL 374186).

15, 2003, and February 9, 2004, Dr. Cope indicated that plaintiff could do sedentary work.[29] (R. 219). Second, the ALJ points to Dr. Mauthe's last appointment with plaintiff, where plaintiff describes his pain level as 3.3/10. Notably, however, at the hearing plaintiff described his pain as between 7 and 10 out of 10. (R. 308). Because of the ALJ's erroneous assignment of weight to the various medical opinions and his focus on the earlier years rather than the later years, which are more relevant in the assessment of a chronic, degenerative condition, the ALJ should reassess his credibility on remand.

### D. The ALJ Properly Concluded that Plaintiff's Impairments, Alone or In Combination, Do Not Meet a Listing

In the alternative, plaintiff argues that the ALJ erred by failing to consider all of his alleged impairments in determining whether he had a disability. (Paper No. 28, 16). Specifically, plaintiff argues that the ALJ erred by treating his various spine conditions as a singular impairment, i.e., degenerative disc disease, rather than a multitude of impairments, i.e., osteoarthritis, spinal stenosis, and herniated nucleus pulposus. (Id.).

---

[29] Sedentary work involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like … small tools …. [A] certain amount of standing is often necessary in carrying out [sedentary] duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

The Fourth Circuit has held that "[i]t is axiomatic that
disability may result from a number of impairments which, taken
separately, might not be disabling, but whose total effect,
taken together, is to render claimant unable to engage in
substantial gainful activity." Walker v. Bowen, 889 F.2d 47, 50
(4th Cir. 1989). Thus, in assessing disability benefit claims,
the ALJ must consider the "combined effect of plaintiff's
impairments and not fragmentize them." Id. (citing Reichenbach
v. Heckler, 808 F.2d 309, 312 (4th Cir. 1985)). Further, the
ALJ must provide a sufficient explanation of his assessment of
the combined impairments. Walker, 889 F.2d at 50. While, to be
conclusively presumed to be disabled, a plaintiff must show that
his impairment or combination of impairments meet all elements
of the relevant listing. Sullivan v. Zebley, 493 U.S. 521, 530
(1990); Bowen v. Yuckert, 482 U.S. 137, 141 (1987). Of course,
a plaintiff need not precisely meet the criteria of the listing
to obtain benefits. Rather, if his impairment or combination of
impairments medically equals the element(s) in the listing, his
disability is presumed and benefits are awarded. 20 C.F.R. §
404.1520(d); Bowen, 482 U.S. at 141-42; S.S.R. 00-3p (2000).
However, if plaintiff's symptoms do not meet or medically equal
all the criteria of any one Listing, the ALJ must proceed to the
fourth step of his evaluation to determine whether the
claimant's impairments or combination of impairments prevent him

40

from performing his previous work or, at step five, any other work in the national economy. 20 C.F.R. §§ 404.1520(e)-(f); Bowen, 482 U.S. at 141-42.

For a determination of disability under Listing 1.04-- disorders of the spine--plaintiff must exhibit: (A) evidence of nerve root compression characterized by, for example, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss, and, if a lower back disorder, positive straight-leg raising test; (B) spinal arachnoiditis characterized by, for example, pain that requires the plaintiff to change position or posture more than once every two hours; and (C) lumbar spinal stenosis characterized by, for example, chronic nonradicular pain and weakness and inability to ambulate effectively.[30] 20 C.F.R. Subpt. P, App. 1, Pt. A, § 1.04.

Here, the ALJ sufficiently considered all of plaintiff's alleged impairments. Plaintiff is incorrect to the extent that he argues that the ALJ did not consider his various back conditions in his disability determination. In fact, the ALJ considered all of plaintiff's various back conditions when he assessed the Listing 1.04 forms completed by Drs. Hsu and Drapkin. (R. 29-30). For example, in analyzing Dr. Drapkin's Listing 1.04 form of October 2007, the ALJ concluded that Dr.

_____

[30] The regulations define "inability to ambulate effectively" as "having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Id. § 1.00(2)(b)(1).

Drapkin's indication of plaintiff's spinal stenosis, facet arthritis, herniated nucleus pulposus, osteoarthritis, and degenerative disc disease satisfies the first part of Listing 1.04(A) and recognized that Dr. Hsu agreed that plaintiff satisfied this section of the Listing.  (R. 29).

Based on this analysis, the ALJ concluded that plaintiff did not meet 1.04(A) because Dr. Drapkin did not note that he suffered from the requisite motor loss.[31]  (Id.).  The record contains some references to motor loss -- evidence not discussed by the ALJ -- and Dr. Drapkin noted in both his 2007 IME report and his 2008 Listing form that plaintiff had muscle weakness or motor loss in his right leg.  (R. 236 (noting atrophy and numbness in plaintiff's right quadriceps); R. 241 (noting right hip flexor weakness); R. 291 (noting numbness and weakness in plaintiff's right thigh); R. 302 (Dr. Drapkin's 2008 report, noting that plaintiff had motor loss)).

The ALJ similarly concluded that the 1.04(B) and 1.04(C) requirements were not met, as Dr. Drapkin did not note in his report that plaintiff suffered from spinal arachnoiditis (1.04(B)) or that he was unable to ambulate effectively (1.04(C)).  (R. 29).  As to 1.04(B), the ALJ merely relied on Dr. Drapkin's failure to state in his IME that plaintiff had spinal arachnoiditis (R. 29), and did not discuss the minimal

---

[31] Motor loss is "atrophy with associated muscle weakness or muscle weakness." 20 C.F.R. Subpt. P, App. 1, Pt. A, § 1.04(A).

evidence in the record that plaintiff's back condition(s) might have required him to change his position or posture more than once every two hours. (R. 225 (noting that plaintiff was only able to sit for 45 minutes at a time); R. 260 (noting that, although plaintiff could "sit, stand and walk six to eight hours per day, . . . frequent position changes would be necessary"); R. 310-11 (plaintiff's testimony that he could only sit for up to an hour at a time)). Despite the multiple MRIs in the record, no "operative note," "pathology report," or "medically acceptable imaging" diagnoses plaintiff with spinal arachnoditis, as required to meet Listing 1.04(B), and none of plaintiff's physicians opined as to whether he met or did not meet this aspect of the listing.

As to 1.04(C), the ALJ similarly relied on Dr. Drapkin's failure to check the required boxes and did not address evidence contained in the record of plaintiff's ambulation problems. <u>See</u> (R. 151 (noting plaintiff's difficulty with toe-to-heel walk); 153 (noting plaintiff's "slow gait"); R. 154 (noting plaintiff's difficulty with toe-to-heel walk); R. 164-65 (noting plaintiff's slow ambulation/difficulty with toe-heel walk); R. 169 (noting that plaintiff ambulated with a pronounced limp); R. 214 (noting plaintiff's "guarded" gait, "with a quick cadence and short step"); R. 244 (noting plaintiff's difficulties with prolonged standing or walking on concrete floors); R. 259-60 (noting

plaintiff's "stiff lumbar flex gait pattern with no assistive device")). However, the record reflects that plaintiff does not use an assistive device (R. 259-60), and plaintiff testified at the hearing before the ALJ that he could walk for an eighth of a mile before his back "ma[de his] pain worse." (R. 312). Again, the record does not provide adequate information to determine whether plaintiff's gait impairments rose to the level of "ineffective ambulation" within the definition of the Listing.[32] 20 C.F.R. Subpt. P, App. 1, Pt. A, § 1.00(B)(2)(b)(1).

Here, although the ALJ did consider these various conditions in combination, the record does not contain adequate information to determine whether plaintiff's impairments meet Listing 1.04(B) or (C). Therefore, this Court will remand the case to the ALJ who shall arrange a consultative examination for plaintiff by an orthopedic specialized who shall examine plaintiff and, particularly, whether he suffers from motor loss, spinal arachnoiditis, and/or ineffective ambulation. The ALJ shall also expand the record as he deems appropriate.

**E.    The ALJ Correctly Relied on the Vocational Expert's Testimony, but Erred in Concluding that Plaintiff Could Perform Jobs in the National Economy**

---

[32] For example, ineffective ambulation includes:
the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.
Id. § 1.00(b)(2).

Plaintiff contends that the ALJ incorrectly ignored the hypothetical questions that plaintiff's attorney posed to the VE at the hearing. (Paper No. 28, 4-6). Based on plaintiff's alleged symptoms, plaintiff's attorney asked whether there were sufficient jobs in the national economy[33] for a hypothetical plaintiff who would (1) miss about five days a month due to back pain, (2) need to sit approximately twice a day for about an hour surrounded by pillows to relieve back pain, and (3) experience pain at a level seven out of ten. (R. 337-38). The VE answered in the negative. (Id.). However, this Court need not go any further because as previously stated the ALJ should reassess credibility in light of the rulings in this opinion. The Court finds no independent error below. The ALJ was not bound to accept plaintiff's testimony regarding the severity of his impairments. See Craig v. Chater, 76 F.3d 585, 594-95 (4th Cir. 1996) (holding that the ALJ must employ a two-part test to determine whether plaintiff's alleged symptoms are credible). Further, plaintiff's daily activities are somewhat inconsistent with his alleged symptoms. Compare (R. 313-14) (stating that plaintiff does not believe he can work for eight hours a day due to pain) with (R. 15) (indicating that plaintiff exhibits a "[n]ormal activity and energy level"). In essence, plaintiff

---

[33] The national economy is defined as "the region where the [plaintiff] lives or … several regions in the country." 20 C.F.R. § 404.1560(c)(1).

faults the ALJ for not considering a hypothetical with facts
that he determined to lack credibility.  Accordingly, this Court
finds that the ALJ properly relied on the VE's testimony.
However, on remand, when the ALJ considers the evidence in light
of this opinion, it may be that the ALJ will pose a different
hypothetical.  However, the Court finds no independent error
below on this point.

    However, the Court does find that the record lacks
substantial evidence to support that plaintiff is able to
perform work in the national economy.  Under the regulations, a
claimant will not be considered disabled if he is "able to work
at the substantial gainful activity level," which "is work
activity that involves doing significant physical or mental
activities."  20 C.F.R. §§ 404.1571, 404.1572(a).  Work can be
"substantial" even if it is done on a part-time basis, and is
"gainful" if it is the type of activity usually done for pay or
profit, regardless of whether a profit is realized.  20 C.F.R. §
404.1572(a)-(b).  Thus, an ALJ's finding that a plaintiff cannot
work a full eight-hour a day, five-day a week work week "does
not necessarily equate with a decision of 'disabled.'"  S.S.R.
96-9p.

    However, where a plaintiff has an RFC for less than a full
work week, whether he will be considered disabled will depend on
whether there is other work in the national economy that he can

perform, taking into account all his limitations.  Id.  See also
Donnell v. Metropolitan Life Ins. Co., 165 Fed. Appx. 288, 296
(4th Cir. 2006) (holding that a plaintiff who was able to
perform up to five hours per day of light work or six hours per
day of sedentary work was not disabled as there were adequate
jobs that were suitable to her professional skills, earnings
history, and physical abilities); Snow v. Heckler, 813 F.2d 403
(4th Cir. 1986) (affirming the ALJ's denial of disability
benefits where plaintiff's positions opined that he could stand
or walk a total of 6 hours in an 8 hour day); Lester v.
Schweiker, 638 F.2d 838 (4th Cir. 1982) (holding that, where
plaintiff was disabled when he could work only five or six hours
per day with additional limitations and lacked the vocational
qualifications to perform jobs that would accommodate those
limitations).

     The ALJ recognized that Dr. Mauthe "did not find the
statement of working 6-7 hours to mean that the claimant could
not complete a normal work day." (R. 31).  While Dr. Mauthe did
comment that "FCE was valid and showed he can only work light
duty" (R. 234), he also failed to comment on whether plaintiff
could work full-time (8 hours) or was limited to 6-7 hours as
the FCE stated.  Additionally, he noted that plaintiff's
"[prognosis is poor for full recovery.]" (Id.).  His comments
thereafter on work capability were simply "discharged with

[unspecified] permanent restrictions." (R. 232, 233). None of the RFCs stated that Mr. Dean could walk, sit, or stand for eight hours. (R. 225, 275). The ALJ did not discuss these limitations when analyzing plaintiff's RFC nor did he pose these limitations to the vocational expert when investigating whether any possible jobs existed in the national economy that would accommodate these limitations. (R. 331-39). On remand, the ALJ should more fully discuss, and if necessary develop, the record on plaintiff's ability to work a full, 8-hour day and whether jobs exist in the national economy that will accommodate and his other restrictions.

## VI. Conclusion

For the above reasons, this Court DENIES plaintiff's motion for summary judgment, DENIES defendant's motion for summary judgment, and GRANTS plaintiff's motion to remand the case for further proceedings consistent with this decision.

Date: 6/11/10                    /s/
                          _____
                          Susan K. Gauvey
                          United States Magistrate Judge